1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDWARD LEE TURNER,

          Petitioner,

    v.

DERRAL ADAMS, Warden,

          Respondent.

_____/

No. C 07-6258 MHP (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

(Docket Nos. 22 & 25)

## INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

In 2003, a Contra Costa Superior Court jury found Petitioner guilty of, <u>inter alia</u>, kidnapping, robbery, torture, and rape.[1] The trial court sentenced Petitioner to 283 years to life in state prison. The California Court of Appeal for the First Appellate District struck the robbery conviction, and otherwise affirmed the judgment. (Ans., Ex. F at 1.) The California Supreme Court denied his petition for review. (Ans., Ex. H.) The state courts denied habeas relief. (Pet. at 4.)

Evidence presented at trial showed that Petitioner committed violent offenses against four women (each individually "Jane Doe") in four separate incidents. The state appellate

court summarized the facts as follows:

Jane Doe 1—May 20, 2001 [Counts 1–6]

Jane Doe 1 was a homeless drug addict and prostitute who frequented a park in Richmond, where she met [Petitioner]. On May 20, 2001, she went with [Petitioner] to his trailer, a few blocks from the park, to see a book he had agreed to show her. Once inside the trailer, [Petitioner] offered her crack cocaine and $3 in exchange for sex. She refused, and started to leave. [Petitioner] stood in her way, holding a knife. He forced her to orally copulate him. He then demanded that she have intercourse with him. She stated she wanted him to use a condom. He initially acceded to her request, but interrupted intercourse to remove the condom, and resumed the assault, as she cried. He held a knife to her throat, told her to shut up, and that she had "nothing to lose." She begged him to let her leave, but he hog-tied her with shoestring and duct tape, and also duct-taped her mouth. He told her she was going to be his sex slave. When he eventually left the trailer, she was able to free herself by burning the string.
....

Jane Doe 2—November 2, 2000 [Counts 7–11]

The court determined that Jane Doe 2 was unavailable for trial. Instead, her preliminary hearing testimony was read to the jury. In the evening of November 2, 2000, Jane Doe 2 was driving through the city of Richmond. She pulled over and asked [Petitioner] if he knew where to get some crack cocaine, and he said he did. They went to his trailer and smoked crack together. Suddenly [Petitioner]'s demeanor changed. He told her he was going to keep her there, punched her, and forced her to orally copulate him. He told her he was not ever going to let her leave. When [Petitioner] went to the bathroom, she escaped, only partially clothed. Officer Cantrell came upon Doe 2, who was hysterical, in an alley near the trailer. She had suffered injuries and her face was swollen. The police did not find [Petitioner] in the trailer, but did find clothing belonging to Doe 2. About four hours later they found [Petitioner] and arrested him.

Jane Doe 4—October 24-27, 1995 [Counts 12–14]

On October 24, 1995, Jane Doe 4 was walking in the area of Fourth Street in Richmond when a man approached her from behind, pressed an object into her back and told her to keep walking or he would kill her. The man led her to a trailer near an alley, ordered her to undress, and tied her up with a rope. When she asked why he abducted her, he said something about her having called the police on his nephew. While she was tied up, the man took a $100 bill from her purse, and went out to buy cigarettes, liquor and crack cocaine. He got high when he returned, and said he was going to have sex with her, and would kill her if she did not cooperate.

[Petitioner] held her prisoner for the period between October 24 through October 27. He beat her with a two-by-four piece of lumber, punched her in the face, and attempted to smother her with a pillow, causing her briefly to lose consciousness. He eventually left the trailer again. When a woman entered a few minutes later, Doe 4 pleaded for help and the woman untied her. Doe 4 dressed and ran to her mother's house, and then went to a hospital, where she

2

made a police report.

Officer Cantrell responded to the report of a battery victim. Doe 4 described her attacker and the alleyway where the attack occurred. She also recalled the name Edward was scratched on one of the walls. Officer Cantrell was familiar with [Petitioner] and where he lived, so he included [Petitioner]'s photo in a photo array. Doe 4 identified [Petitioner]'s photograph. She also identified [Petitioner] at trial.

Jane Doe 5—September 29, 1995 [Counts 15–17]

On September 29, 1995, at approximately 6 p.m., Jane Doe 5 saw [Petitioner], whom she had met once before, on Fifth Street in Richmond. She agreed to have dinner with [Petitioner] at his trailer. After smoking crack, he ordered her to undress and put on lingerie. He tied her hands with a shoestring. He held a knife to her throat and forced her to orally copulate him. He eventually untied her, and she escaped into the alley, where she began screaming for help. [Petitioner] chased her, but stopped when she reached the alley.

Officer Anthony Mikell responded to a call, and found Doe 5 standing in the street wearing lingerie and a trench coat. She described being forced to orally copulate [Petitioner]. She pointed out [Petitioner], who was standing outside the trailer, and Officer Mikell arrested [Petitioner]. She declined to go to the hospital. The police entered the trailer with Doe 5. Inside the trailer Doe 5 identified some of her clothing, and her shoes. Police officers also testified that they found white string on the bed, but found no knife in the trailer or on [Petitioner]'s person.

(Ans., Ex. F at 2–4.)

As grounds for federal habeas relief, Petitioner alleges that (1) defense counsel rendered ineffective assistance in various ways; (2) his upper term sentence violated the Sixth Amendment and the Ex Post Facto Clause, as well as the terms of his earlier plea agreements; (3) his right to due process was violated by the use of an impermissibly suggestive photo identification procedure; (4) his right to due process was violated because there was excessive pre-accusation delay in prosecuting his 1995 offenses; (5) his right to due process was violated by the trial court's denial of his motion for a severance of several counts; (6) his rights to due process were denied when the trial court admitted evidence of uncharged offenses to show his propensity to commit sex offenses; (7) his rights to due process and to confront witnesses were denied when the court admitted the statements of a non-testifying victim; (8) his rights to due process and a conflict-free defense attorney were violated by the denial of his motion to recuse the district attorney without a conflict waiver or

3

inquiry into the asserted conflict; (9) the government failed to disclose exculpatory evidence to the defense, in violation of Brady v. Maryland, 373 U.S. 83 (1963); (10) his rights to due process, to effective assistance of counsel, and to present a defense were violated by the trial court's denial of a continuance during the trial for Petitioner to obtain testimony of an incarcerated witness; (11) his right to due process was violated by the use of the CALJIC Nos. 2.50.01, 2.50.1, and 2.50.2 jury instructions at his trial; (12) his right to due process was violated by the use of the CALJIC No. 2.21.2 jury instruction at his trial; (13) his right to due process was violated by the trial court's failure to declare a mistrial or grant a new trial after the prosecutor hugged two of the victims; (14) there was cumulative error; (15) he was denied his rights to due process and the effective assistance of counsel by the trial court's failure to conduct a hearing and inquire into a conflict of interest.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's

4

decision but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409.

## DISCUSSION

### 1. Assistance of Counsel

Petitioner claims that defense counsel rendered ineffective assistance when (A) he failed to sufficiently consult with defendant before trial, failed to investigate the facts of the crimes, was seriously ill during the trial, (B) failed to interview and call material witnesses, and (C) failed to subpoena material evidence.[2] (Pet. at 5ff.) The Court will address these contentions below. The state appellate court did not address these claims in its written opinion.

Claims of ineffective assistance of counsel are examined under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two things. Firstly, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. <u>Id.</u> at 687–68. Secondly, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. <u>Id.</u> Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695.

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong. See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

### A.  Alleged Failure to Consult and Investigate

Petitioner has alleged that defense counsel failed to sufficiently consult with defendant before trial, failed to investigate the facts of the crimes, and was seriously ill during the trial.[3] (Pet. at 5–6.) Whatever its merits, Petitioner's claim is insufficiently detailed. Though he has pointed to a few specific instances of an allegedly deficient performance — such as that defense counsel met with Petitioner fewer than ten times — Petitioner has not stated exactly how these alleged deficiencies adversely affected his defense. In short, he has not shown prejudice. Furthermore, the evidence against Petitioner was quite strong, as instanced by first-hand descriptions of events provided by the victims. On this record, Petitioner's claim is DENIED.

### B.  Witnesses

Petitioner claims that defense counsel failed to interview or call to testify eight defense witnesses. (Pet. at 7.). These eight persons, Petitioner contends, would have offered evidence to impeach the credibility of the victims. (Id. at 7–8.)

Petitioner has not shown that he is entitled to habeas relief on this claim. Firstly, Petitioner's claims are insufficiently detailed. For instance, Petitioner alleges that one witness could have testified that "Jane Doe 2 gave false information to the police." (Pet. at 7.) Another "would have impeach[ed] Jane Doe IV at trial." (Id. at 8.) Such vague allegations do not provide enough information for the Court to evaluate whether defense counsel's actions constituted a deficient performance. For example, Petitioner does not state what Doe 2's false information was, how it was false and who determined it to be so, and how such evidence bore directly on Doe 2's credibility.

6

1    Petitioner's inability to provide specific information regarding the testimony these

2   eight persons may have given supports the conclusion that defense counsel's decision not to

3   interview or call the eight witnesses was a reasonable tactical decision.  This Court must

4   accord such reasonable tactical decision deference.  Sanders v. Ratelle, 21 F.3d 1446, 1456

5   (9th Cir. 1994).  As Petitioner cannot demonstrate that defense counsel's performance was

6   deficient, the Court need not address whether such actions resulted in prejudice.  See

7   Siripongs, 133 F.3d at 737.  On this record, Petitioner's claim is DENIED.

8        **C.    Subpoena Material Evidence**

9        Petitioner also alleges that defense counsel failed to subpoena his and Jane Doe 4's

10  mental health records.  His records, Petitioner asserts, would show that his criminal actions

11  are attributable to the effects of alcohol and medication.  (Pet. at 8.)  Petitioner does not state

12  what Doe 4's records contain, or might contain.

13       With respect to the first part of this claim, Petitioner has not shown that defense

14  counsel's performance was deficient.  Firstly, Petitioner does not state what mental illness he

15  has, nor how exactly such mental illness affected his state of mind.  Secondly, it is unclear

16  how mental health records could contain information that at the time of the criminal acts

17  Petitioner was under the effects of alcohol and medications.  As Petitioner cannot

18  demonstrate that defense counsel's performance was deficient, the Court need not address

19  whether such actions resulted in prejudice.  See Siripongs, 133 F.3d at 737.

20       With respect to the second part of his claim, Petitioner does not state what Doe 4's

21  mental health records contained, or might have contained.  Without such specific details, this

22  Court cannot assess whether defense counsel's failure to subpoena such records constituted a

23  deficient performance.

24       On this record, Petitioner's claim is DENIED.

25  **2.    Sentence**

26       Petitioner claims that his aggravated sentence violated (A) his right to a jury trial

27  under the Sixth Amendment, (B) the Ex Post Facto Clause, and (C) the terms of his earlier

28

7

plea agreements. The state appellate court did not rule on these claims in its written opinion.

### A. Sixth Amendment

Petitioner claims that his upper term sentences for counts 1–3 are unconstitutional because they were based on factors not admitted by Petitioner. (Pet. at 15.)

The trial court imposed the upper term of eight years for counts 1–3 (one count of forcible oral copulation, and two counts of rape), crimes committed against Jane Doe 1. (Ans., Ex. B, Vol. 15 at 2047–49.) The trial court imposed this upper term sentence because "the victim was brought back to the trailer and forced to perform the various sex acts involved in this particular case [which were] particularly heinous in terms of the fear and horror that was visited upon the victim." (Id. at 2048–49). The Court interprets this conclusion as a finding under California Rules of Court 4.421(a)(1), a factor justifying the imposition of an upper term, or aggravated, sentence.

The Sixth Amendment requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The "statutory maximum" discussed in Apprendi is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; in other words, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather the maximum he could impose without any additional findings. Blakely v. Washington, 542 U. S. 296, 303–04 (2004). In California, the middle term is deemed the statutory maximum, and thus the imposition of the upper term, such as in the instant case, can implicate a criminal defendant's Apprendi rights. See Cunningham v. California, 549 U.S. 270, 293 (2007). In California, sentencing courts are to consider various aggravating and mitigating factors in determining whether to impose an upper term. See Cal. Rules of Court 4.421 & 4.423. A single aggravating factor is sufficient to authorize a California trial court to impose the upper term. People v. Osband, 13 Cal. 4th 622, 728 (Cal. 1996). One aggravating factor is that the

United States District Court
For the Northern District of California

"crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." Cal. Rules of Court 4.421(a)(1).

Petitioner's upper term sentence is self-evidently erroneous under <u>Cunningham</u>. Specifically, the factor used by the trial court was not based on facts admitted by Petitioner or reflected in the jury's verdict. Therefore, the imposition of the upper term, thereby increasing Petitioner's sentence beyond the statutory maximum, based on the factor cited by the trial court, is unconstitutional under <u>Cunningham</u>.

However, <u>Blakely</u> and <u>Apprendi</u> sentencing errors are subject to a harmless error analysis. <u>Washington v. Recuenco</u>, 548 U.S. 212, 221 (2006). Applying <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), the Court must determine whether "the error had a substantial and injurious effect" on Petitioner's sentence. <u>Hoffman v. Arave</u>, 236 F.3d 523, 540 (9th Cir.2001) (internal quotation marks omitted). Under that standard, the Court must grant relief if it is in "grave doubt" as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt. <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995). Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." <u>Id.</u> at 435.

Applying these legal principles to the instant matter, the Court concludes that the error was harmless. In sum, sufficient evidence exists in the record to support the trial court's imposition of the upper term on grounds that the crimes committed against Jane Doe 1 "involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness," as defined in Cal. Rules of Court 4.421(a)(1). According to the state appellate court's factual summary, Petitioner raped Jane Doe 1, removed his condom during the rape, thereby exposing the victim to contagious sexually transmitted diseases, threatened her with a knife, trapped her in his trailer after the rape, and bound her body and mouth with duct tape and shoestring. Such a record of violence and cruelty supports the trial court's finding. On such evidence, and in light of the

1   highly deferential AEDPA standard, the Court does not have "grave doubts" as to whether a

2   jury would have found the relevant aggravating factor beyond a reasonable doubt, and,

3   accordingly, the Court must deny Petitioner habeas relief on his sentencing claim.

4       Furthermore, another, easily verifiable, factor existed to support the imposition of the

5   upper term.  Specifically, Petitioner had served a prior prison term.  Such a fact is a

6   circumstance in aggravation, justifying the imposition of the upper term.  <u>See</u> Cal. Rule of

7   Court 4.421(b)(3).

8       The trial court's decision being free from prejudicial error, Petitioner's claim is

9   DENIED.

10      **B.    Ex Post Facto**

11      The trial court sentenced Petitioner in part according to the requirements of

12  California's Three Strikes Law.[4]  Petitioner contends that application of this 1994 law to his

13  convictions violates the Ex Post Facto Clause.  (Pet. at 17.)

14      The Ex Post Facto Clause protects a criminal defendant from criminal legislation that

15  effects an increase in punishment, criminalizes conduct that was not previously criminal,

16  requires less or different proof for conviction of an offense than was previously required, or

17  deprives a criminal defendant of any defense available at the time the crime was committed.

18  <u>See</u> <u>Collins v. Youngblood</u>, 497 U.S. 37, 42 (1990) (citing <u>Calder v. Bull</u>, 3 Dall. 386, 390

19  (1798)).

20      However, "[t]he Supreme Court [] uniformly ha[s] held that recidivist statutes do not

21  violate the Ex Post Facto Clause if they are 'on the books at the time the [present] offense

22  was committed.'"  <u>U.S. v. Kaluna</u>, 192 F.3d 1188, 1199 (9th Cir. 1999) (quoting <u>U.S. v.</u>

23  <u>Ahumada-Avalos</u>, 875 F.2d 681, 683–84 (9th Cir. 1989) (per curiam)).  Three Strikes

24  became effective — was "on the books" — on March 7, 1994.  <u>See</u> <u>People v. Superior Court</u>

25  <u>(Romero)</u>, 13 Cal.4th 497, 505 (Cal. 1996).

26      This Court is bound by the Ninth Circuit decision in <u>Kaluna</u>.  Because Petitioner

27  committed the instant offenses in 1995, 2000 & 2001— that is, after the Three Strikes law

28

10

became effective in 1994 — his claim under the Ex Post Facto Clause challenging the application of that law to the trial court's sentencing determination is without merit. Accordingly, Petitioner's claim is DENIED.

### C.     Plea Agreement

Petitioner appears to contend that the use of his prior convictions from an unrelated case to enhance his current offense violates his plea agreement. (Pet. at 23.) The state appellate court did not address this claim in its written opinion.

Petitioner's claim is insufficiently detailed. Though he alleges that the state changed the terms of his plea agreement, Petitioner has not stated which plea agreement he means, or its terms, or any other details, with the exception that he waived his right to a jury trial. Without a reasonably detailed claim, this Court cannot evaluate its merits. Accordingly, Petitioner's claim is DENIED.

### 3.     Admission of Pretrial Identification

Petitioner claims that the trial court's denial of his motion to suppress Jane Doe 4's pretrial identification of Petitioner violated his right to due process because the photographic lineup shown to the victim was impermissibly suggestive. (Pet. at 25.) According to Petitioner, he "is the only person depicted whose left eye is messed up, not just closed or partially closed." (Id.)

The state appellate court summarized the relevant facts and its decision on the claim as follows:

> At the suppression hearing, Officer Cantrell testified that, on October 27, 1995, he contacted Jane Doe 4 at Kaiser Hospital in Richmond where she was hospitalized. She described her assailant as a "black male, approximately 6' 2", 190 pounds, bald head or really shortcut, unshaven, and his left eye was missing or possibly messed up." She also described her assailant as "[a]pproximately 30 to 35 years old, brown hair, brown eyes, really skinny, wearing dark colored top and blue jeans." Based upon the victim's description, Officer Cantrell compiled a photographic lineup, consisting of six pictures, including one of [Petitioner]. He attempted to find pictures of men who had "messed up or missing left eyes." Before showing the photo lineup to Doe 4 he admonished her that she should not allow the fact that a photo is shown to her to influence her judgment, or assume the assailant is depicted in one of the photos. He further advised her that she should not guess, that it just as important to free innocents as it is to identify the guilty, and she had no

11

1  obligation to identify anyone. Afer viewing each of tile photographs very
   carefully, Doe 4, pointed to [Petitioner's] photo and said, "[T]hat's him right
2  there." Cantrell asked her to take another close look and make sure,
   whereupon she again identified [Petitioner]. The photo lineup was also
3  submitted to the court. The trial court denied [Petitioner's] motion to suppress
   evidence of the identification because it found no "unwarranted suggestibility."
4  . . . .

5  [Petitioner] argues that the photographic display was impermissibly suggestive
   because only his photograph clearly depicted a person whose left eye "is
6  messed up, not just closed or partially closed."

7  Our independent review of the photographic lineup satisfies us that the photo
   lineup was not impermissibly suggestive . . . The photographs all depicted
8  black males of generally the same age and build, with similar hair length.
   Moreover, contrary to [Petitioner's] characterization, several of the other
9  photos depict individuals with some kind of left eye defect. In addition to
   picture 5, depicting [Petitioner], the subject of picture 1 appears to have a
10 walleye; the subject of picture 4 has a left eye that is partially closed; and the
   subject of picture 6 has a slightly droopy left eyelid. The subjects of photos 2
11 and 3 have their eyes closed . . . We find no significant disparities in
   appearance that would have singled [Petitioner] out and made identification of
12 his photo a foregone conclusion. The trial court therefore correctly denied the
   motion to suppress the pretrial identification of [Petitioner] from this photo
13 array.

14 (Ans., Ex. F at 14–16.)

15     Due process protects against the admission of evidence deriving from suggestive

16 pretrial identification procedures. See Neil v. Biggers, 409 U.S. 188, 196 (1972). To prevail

17 on habeas review, a petitioner must show that the identification procedures used in the case

18 were "'so unnecessarily suggestive and conducive to irreparable mistaken identification that

19 he was denied due process of law.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995)

20 (quoting Stovall v. Denno, 388 U.S. 293, 301–02 (1967)).

21     Here, the record does not support Petitioner's assertion that the photographic line up

22 was impermissibly suggestive. Rather, the victim was shown photographs of persons who

23 looked similar to each other — African-American males with abnormal left eyes. In

24 particular, and contrary to Petitioner's assertion, each matched her description of having a

25 left eye that was "missing or possibly messed up," a factual determination by the state court

26 to which this Court must defer. See 28 U.S.C. § 2254(e). On this record, the Court finds no

27 evidence that Petitioner's constitutional rights were violated. Accordingly, Petitioner's

28

claim is DENIED.

**4.     Pre-Accusation Delay**

Petitioner claims that the trial court violated his speedy trial right when it denied his

motion to dismiss charges for the 1995 offenses.  (Pet. at 26.)  There was a delay of six years

from the occurrence of the alleged incident to when Petitioner was charged for such offense.

The state appellate court summarized the facts and its holding as follows:

> Despite the fact that [Petitioner] had been identified in connection with the
> assaults in 1995, the information alleging the offenses involving Does 4 and 5
> was not filed until August 2001.  [Petitioner] contends that the court should
> have granted his motion to dismiss the offenses involving Does 4 and 5
> because the pre-accusation delay resulted in prejudice to him, and dismissal
> was the appropriate remedy to avoid a violation of his due process right to a
> fair trial.
> . . . .
>
> The trial court ruled that, assuming arguendo [Petitioner] had met his burden of
> showing prejudice, his showing was relatively weak, and was outweighed by
> the showing of justification for the delay.  We agree, and shall conclude that the
> pre-accusation delay did not deprive [Petitioner] of due process and a fair trial.
>
> With respect to the counts involving Doe 4, [Petitioner] demonstrated that there
> was a witness, Latasha Collie, who could have provided a partial alibi, and he
> documented the defense investigator's unavailing efforts to find her.
> According to Officer Cantrell, when he went to the trailer to arrest [Petitioner]
> in 1995, a woman named Latasha Collie was present and stated she had been
> with [Petitioner] from October 15, 1995, through October 27, 1995, and had
> been with him "almost all day."  [Petitioner] failed to establish, however,
> whether Collie's statement that she had been with [Petitioner] "almost all day"
> referred only to October 27, 1995, which was only the day Doe 4 escaped, or
> every day between October 15, 1995, and October 27, 1995.  Under either
> construction of Collie's statement, however, the fact remains that she did not
> state she had been with [Petitioner] at all times, but only "almost all day."
> Therefore, at best, she could only have provided a partial alibi.  It is not likely
> this partial alibi witness would have had an impact on the outcome of the case,
> in light of the strength of the victim's identification of [Petitioner] from the
> photo lineup, and later at trial, the accuracy and detail of her description of her
> assailant and the trailer where the assaults occurred, and the evidence tying
> [Petitioner] to that trailer, including the victim's reference to having seen the
> name "Edward" on the wall.  Therefore, [Petitioner]'s showing of prejudice
> with respect to the offenses involving Doe 4 was, at best, minimal.
>
> With respect to Doe 5, [Petitioner]'s showing of prejudice was even weaker.
> Apparently, [Petitioner]'s theory of prejudice was that witnesses had existed
> who could have testified that Doe 5 was a working prostitute, and this evidence
> would have supported his defense that the acts were consensual.  Yet, he did
> not identify any particular witness who could no longer be found.  Nor did he
> present evidence of efforts to find such witnesses in support of this motion.  In
> the absence of more specific evidence that Doe 5 was working as a prostitute

the night the offenses allegedly occurred, and went to [Petitioner]'s trailer pursuant to an agreement to perform an act of prostitution, evidence that Doe 5 worked as a prostitute would have had little probative value on the issue of her consent to the acts committed that night. Moreover, it is not likely that testimony that she was a working prostitute would have affected the outcome in light of other overwhelming evidence belying consent, such as the victim's flight in nothing but lingerie, and the police testimony describing her state of agitation immediately after escaping.

Weighed against this weak showing of prejudice was a strong showing of justification for the delay, i.e., the refusal of the victims to cooperate with the investigation of the offense. Detective Gagan testified that in the course of investigating the May 2001 incident he did a records check and saw that [Petitioner] had been a suspect in several other crimes involving a similar modus operandi, including the two cases in 1995 involving Doe 4 and Doe 5. He also found a 1996 case involving a Jane Doe 3. He decided to investigate why charges involving offenses against Doe 4 had not been filed. In the original file he found a note, apparently from Doe 4, stating she was afraid of [Petitioner] and did not want to pursue the charges.

Detective Gagan asked two officers to contact Doe 4, and have her come to his office for an interview. When he met with her, she continued to express her view that the police could not protect her. Gagan learned of at least two incidents of intimidation she had reported, and based upon these incidents, he was able to get her in the victim relocation program. She then became cooperative and willing to participate in the prosecution.

With respect to Doe 5, Gagan also reviewed the original police file. Gagan testified that the detective assigned to the case in 1995 made two attempts to contact Doe 5, who was homeless, through her mother. She promised to give Doe 5 the detective's telephone number, and have her call. In the second contact, she stated Doe 5 had said she did not intend to return the call to make a report. The detective assigned to the case in 1995 concluded that the case should be closed because of the victim's refusal to cooperate with the investigation.

In light of the refusal of either Doe 4 or Doe 5 to cooperate with the investigation, the Richmond police did not submit the cases to the district attorney to consider for prosecution. The failure of a key witness to cooperate is a valid investigative reason for delay in bringing charges because, although a prosecutor might be able to obtain a conviction under such circumstances, that possibility is certainly diminished.

[Petitioner] nonetheless argues that the showing of justification for the delay was not adequate, and did not outweigh the prejudice it caused, because the steps taken by Gagan to obtain the cooperation of Doe 4 and 5 could have been taken earlier when [Petitioner] was prosecuted for other sex offenses in 1996. With respect to Doe 5 he also suggests that the police simply gave up too easily after only two contacts with her mother, because when Gagan finally did seek her out again in 2001, she responded and cooperated. Yet, he offered nothing but pure speculation that the measures Gagan took to secure the cooperation of these victims would have been successful had they been taken in 1996. There was no evidence that Doe 4 would have been eligible for, or willing to enter, a witness protection program, or that one existed at that time. In light of the notation in the file that Doe 5 had affirmatively stated her intention not to call and

14

1    cooperate with the detective, further attempts to contact Doe 5 would likely
     have been futile. Any number of other factors in the intervening years could
2    have played a role in the willingness of these victims to cooperate. We decline
     to find a due process violation based merely upon speculation that the
3    cooperation of Does 4 and 5 might have been obtained sooner . . .
     Significantly, the trial court found that the delay was not intentional, and did
4    not occur for the purpose of obtaining a tactical advantage. Gagan's testimony
     amply supports that finding. There was simply no evidence at all that, in 1996,
5    the prosecution was aware of the closed police files on Doe 4 and Doe 5, and
     intentionally did not pursue those charges. It was not until May 2001 that
6    Gagan discovered the files and their similarity to charges he was investigating,
     and he turned them over to the district attorney for prosecution as soon as he
7    was able to secure the cooperation of the witnesses.

8    (Ans., Ex. F at 16–21.)

9
10       A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment

11   to the Constitution and imposed by the Due Process Clause of the Fourteenth Amendment on

12   the states. Klopfer v. North Carolina, 386 U.S. 213, 223 (1967). No per se rule has been

13   devised to determine whether the right to a speedy trial has been violated. Instead, courts

14   must apply a flexible "functional analysis," Barker v. Wingo, 407 U.S. 514, 522 (1972), and

15   consider and weigh the following factors in evaluating a Sixth Amendment speedy trial

16   claim: (1) length of the delay; (2) the reason for the delay; (3) the defendant's assertion of

17   his right; and (4) prejudice to the defendant. Doggett v. U.S., 505 U.S. 647, 651 (1992);

18   Barker, 407 U.S. at 530; U.S. v. Lam, 251 F.3d 852, 855 (9th Cir.), amended, 262 F.3d 1033

19   (9th Cir. 2001). None of the four factors are either a necessary or sufficient condition for

20   finding a speedy trial deprivation. Barker, 407 U.S. at 533. They are related factors and

21   must be considered together with such other circumstances as may be relevant. Id. The

22   Ninth Circuit considers the second factor, i.e., the reason for the delay, the "focal inquiry."

23   U.S. v. King, 483 F.3d 969, 976 (9th Cir. 2007) (citing U.S. v. Sears, Roebuck & Co., 877

24   F.2d 734, 739–40 (9th Cir. 1989)).

25       Applying these principles to the instant matter, the Court concludes that Petitioner has

26   not shown that he is entitled to habeas relief on this claim, even though some of the factors

27   weigh in his favor. As to the first factor, a six-year delay is sufficiently lengthy to be

28   presumptively prejudicial. Depending on the nature of the charges, the lower courts have

generally found post-accusation delay presumptively prejudicial at least as it approaches one year. See Doggett, 505 U.S. at 651 n.1. While this factor weighs in favor of Petitioner, the second factor, the "focal inquiry," does not. According to the facts stated above, the police did not pursue charges against Petitioner because the key witnesses did not want to participate in the investigation of the crimes. Doe 4 actually wrote to the police stating that she was afraid of Petitioner, and did not want to pursue charges. Doe 5, owing to her homelessness, was difficult to contact. When contact was made through her mother, Doe 5 indicated that she did not want to assist in the investigation. Though the government was more responsible for the delay than Petitioner, such delay was reasonable considering that the key witnesses refused to assist in the investigation.

As to the third factor, Petitioner timely and clearly asserted his right to a speedy trial through his filing of a motion in the trial court. While this factor weighs in favor of Petitioner, the fourth, and final, factor does not. Specifically, Petitioner has not shown that he was prejudiced by the delay. Petitioner asserts that during the delay, an alibi witness lost his/her memory of significant facts, and that one of the victims worked as a prostitute. As to the first assertion, Petitioner does not name the witness, nor detail how his/her testimony would have assisted him at trial. As to the second assertion, Petitioner has not shown how that fact arose from the delay, or caused prejudice. On this record, Petitioner's claim is DENIED.

**5.    Severance**

Petitioner claims that the trial court violated his right to due process when it denied his motion to sever the counts against Does 4 and 5. (Pet. at 27.)

The state appellate court summarized the facts and its holding as follows:

> The [trial] court denied [Petitioner]'s pretrial motion to sever the counts involving Does 4 and 5. [Petitioner] does not dispute that the statutory requirements for joinder were met. He nonetheless contends the court abused its discretion in denying the motion because the potential prejudice to [Petitioner] outweighed the state's interest in the efficiency of a joint trial. [Citations removed.]
> . . . .

16

> [Petitioner] argues that the evidence of his crimes involving Doe 4, at least, were not cross-admissible pursuant to Evidence Code section 1108 because the charged offenses were not sexual. He is correct that [Petitioner] was not alleged to have committed a sexual act upon Doe 4, but ignores the fact that the information specifically alleged that he kidnapped her with the intent to commit rape. Moreover, the court was also apprised of the fact that there would be evidence that [Petitioner] ordered Doe 4 to remove all her clothes, stated that he was going to have sex with her, but was thwarted by her escape. . . .
>
> For the foregoing reasons, we conclude the court did not abuse its discretion by denying the motion to sever.

(Ans., Ex. F at 21–22.)

A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997); Herd v. Kincheloe, 800 F.2d 1526, 1529 (9th Cir. 1986). It also may result in the deprivation of the specific constitutional guarantee of the right of confrontation. Id.

A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. Grisby, 130 F.3d at 370. Nor is it concerned with procedural right to severance afforded in federal trials. Id. Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair. Id. In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

There is a "high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." United States v. Lewis, 787 F.2d 1318, 1322 (9th Cir. 1986). This risk is especially great when the prosecutor encourages the jury to consider the two sets of charges in concert, e.g., as reflecting a modus operandi even though the evidence is not cross admissible, and when the evidence of one crime is substantially

17

weaker than the evidence of the other crime. <u>Bean v. Calderon</u>, 163 F.3d 1073, 1084–85 (9th Cir. 1998). But joinder generally does not result in prejudice if the evidence of each crime is simple and distinct (even if the evidence is not cross admissible), and the jury is properly instructed so that it may compartmentalize the evidence. <u>Id.</u> at 1085–86; <u>see</u>, e.g., <u>Davis v. Woodford</u>, 384 F.3d 628, 638–39 (9th Cir. 2004) (denial of motion to sever trial of capital and noncapital charges based on separate incidents not a violation of due process because evidence was cross-admissible, the weight of evidence with respect to each incident was roughly equal, the evidence as to each incident was distinct, and the jury was properly instructed); <u>Sandoval</u>, 241 F.3d at 773 (given the strength of the state's case against petitioner on both sets of murders and the cross-admissibility of the evidence on each set, petitioner's trial was not actually prejudiced by the joinder).

Petitioner has not shown that he suffered prejudice or that he received a fundamentally unfair trial in violation of due process. The record supports the conclusion that the evidence with respect to each incident was distinct, equal and quite strong, and that the jury was instructed to compartmentalize the evidence. Specifically, as detailed above each Jane Doe provided strong and specific evidence of Petitioner's guilt as to each offense — a visit to Petitioner's trailer that resulted in a sexual assault in one, a search for cocaine that resulted in sexual assault in the second, an abduction in another, and a date that resulted in another sexual assault in a fourth — for the jury to apply the appropriate evidence to the specific charge.

The trial court's instructions reiterated the jury's duty to give proper weight to each fact. Such instructions included several on determining each witness's credibility (Ans., Ex. A at 1816–20), the acts required to satisfy the elements of the charged offenses (<u>id.</u>, 1846–1904), and that the prosecution has the burden to prove each element of each offense (<u>id.</u>). Jurors are presumed to follow the court's instructions. <u>See</u> <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987). On this record, there is no indication that the jury misapplied the evidence, or that evidence from a strong case was misapplied to support charges in a weaker one.

1    Accordingly, Petitioner's claim is DENIED.

2    **6.      Admission of Uncharged Sexual Offenses**

3          Petitioner claims that the trial court violated his rights to due process when it allowed

4    evidence of uncharged sexual offenses as propensity evidence.[5]  (Pet. at 27.)  The state

5    appellate court rejected Petitioner's claim, finding the evidence of the uncharged offenses

6    relevant to show a propensity to commit sexual crimes, "and had significant probative value

7    on the key issue of consent."  (Ans., Ex. F at 23, 24.)

8          The state appellate court summarized the relevant facts and its holding on Petitioner's

9    claim as follows:

10          The evidence with respect to Doe 6 was that, on August 16, 1993, [Petitioner]
            was convicted, based upon his plea, of assault with intent to commit rape.  Doe
11          6 had been a friend of [Petitioner]'s for many years.  She went to [Petitioner]'s
            house because he was going to help her with some Social Security documents.
12          Instead of helping her, [Petitioner] drank alcohol and consumed drugs.  When
            Doe 6 rebuffed his sexual advances, he suddenly became violent.  He punched
13          her and ordered her to take off her clothes.  He ordered her to orally copulate
            him and attempted sexual intercourse.  He held her captive until the next
14          morning when she was able to escape after [Petitioner] passed out.  She
            immediately reported the attack to the police.  Photographs were taken of the
15          injuries, which included the need for stitches in her mouth.

16          Jane Doe 7 testified that in 1998 or 1999 she met [Petitioner] in the park and
            agreed to perform an act of prostitution. They went to his trailer and smoked
17          crack cocaine.  She insisted that [Petitioner] use a condom, but [Petitioner]
            interrupted intercourse to remove it.  She told him no, but he held her down and
18          had sex with her without a condom.  She kicked him in the testicles and
            escaped.  Doe 7 reported the incident to a police officer that same day, but he
19          was not sure whether he took a report, and she never followed up on the matter.
            At the time of trial she was in custody on a warrant for prostitution.

20

21          . . . .

22          The court properly considered the relevant factors, and did not abuse its
            discretion in concluding the probative value of this evidence outweighed the
23          potential prejudice.  The evidence of the uncharged offenses was relevant, and
            had significant probative value on the key issue of consent.  The defense
24          consisted largely of an attack on each victim's credibility.  Many of the victims
            were prostitutes, had substance abuse problems, and had prior felony
25          convictions involving moral turpitude.  Thus, evidence of [Petitioner]'s prior
            uncharged sexual offenses was highly relevant to rebut the defense attempt to
26          paint the current victims as liars, motived to make false charges against
            [Petitioner] because of disputes over drugs or payment for acts of prostitution.

27          The uncharged offenses were also sufficiently similar: In the assault on Doe 6,
            [Petitioner] brutally beat, sexually assaulted and imprisoned his victim just as
28

1  he did with Does 1, 2, and 4. The assault on Doe 7 was similar to the charges
2  involving Doe 1, in that the victim was a prostitute, and he forced her
   to submit to sexual intercourse without a condom. Nor were these uncharged
3  offenses committed in 1993 and 1998–1999 too remote to be probative.

(Ans., Ex. F at 23.)

The trial court admitted the evidence regarding Does 6 and 7 under California

Evidence Code section 1108(a), which states that "[i]n a criminal action in which the

defendant is accused of a sexual offense, evidence of the defendant's commission of another

sexual offense or offenses is not made inadmissible by Section 1101 [generally forbidding

the use of character evidence to show action in conformity therewith], if the evidence is not

inadmissible pursuant to Section 352 [which allows a trial court to exclude evidence if its

probative value is outweighed by its prejudicial effect]." (Id. at 6.)

The admission of evidence is not subject to federal habeas review unless a specific

constitutional guarantee is violated or the error is of such magnitude that the result is a denial

of a fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021,

1031 (9th Cir. 1999). The Supreme Court has left open the question of whether admission of

propensity evidence violates due process, i.e., whether a constitutional guarantee has been

violated. Estelle v. McGuire, 502 U.S. 62, 67–71 (1991). Based on the Supreme Court's

reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's

due process right concerning the admission of propensity evidence — such as the uncharged

sexual offenses at issue here — is not clearly established as required by AEDPA. Alberni v.

McDaniel, 458 F.3d 860, 866–67 (9th Cir. 2006); accord Mejia v. Garcia, 534 F.3d 1036,

1046 (9th Cir. 2008) (reaffirming Alberni).

Furthermore, courts have "routinely allowed propensity evidence in sex-offense cases,

even while disallowing it in other criminal prosecutions." U.S. v. LeMay, 260 F.3d 1018,

1025 (9th Cir. 2001). "California's Rule 1108 was modeled after the Federal Rules, and

contains an express requirement that courts balance the probative value of the evidence

against its prejudicial effect." Wolff v. Newland, 67 Fed. Appx. 398 (9th Cir. 2003).

20

Regarding the magnitude of the error, only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process such that petitioner was denied a fundamentally fair trial. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Here, the prosecutor sought to show that the similarity between the crimes severely weakened Petitioner's contention that the victims were not credible.

In sum, because the Supreme Court expressly has left open the question presented in the petition, Petitioner's claim that the trial court's admission of propensity evidence under section 1108 violated his due process rights is without merit. Furthermore, Petitioner has not articulated grounds for a separate claim based on equal protection. Accordingly, Petitioner's due process and equal protection claims are DENIED.

**7.     Unavailability Determination**

Petitioner claims that the trial court violated his right to due process when it concluded that Doe 2 was unavailable to testify, thereby allowing the prosecution to present Doe 2's preliminary hearing testimony to the jury. (Pet. at 31.) According to Petitioner, "the prosecution failed to exercise due diligence to secure this witness for trial." (Id.) "If the authorities had taken a few more weeks before trial, this known-to-be transient witness could have been produced." (Id.) The state appellate court rejected this claim, finding that "the prosecution made exhaustive and sustained good faith efforts to locate Doe 2 over an approximate two-week period." (Ans., Ex. F at 27.)

The state appellate court summarized the relevant facts as follows:

The evidence at the hearing on Jane Doe 2's unavailability demonstrated the requisite sustained and substantial good faith efforts: The subpoena clerk testified that there had been five trial dates and she had mailed subpoenas to Doe 2's last known address for each one. Service was successful for the third trial date in 2002. That subpoena was sent to Santa Rita jail, where Doe 2 was then being detained. The others, which were sent to the mother's address, did not result in any response from Doe 2 by telephone or mail. The fourth subpoena was served in July 2003. The clerk served a subpoena for the most recent trial date on November 3, 2003. The clerk had also called several local hospitals, the coroner's office, and the California Department of Corrections in an effort to locate Doe 2. An investigator also determined that she was not in the custody of the Department of Corrections.

21

Sergeant Gagan testified that, when Doe 2 testified at the preliminary hearing in July and August 2001, he reconfirmed her contact information, consisting of her mother's address and telephone number. On October 31, 2003, he contacted Doe 2's mother, who stated she only had sporadic contact with Doe 2, but promised she would relay the message that Sergeant Gagan was looking for Doe 2. He next contacted Doe 2's court-appointed advocate, who had assisted Doe 2 at the preliminary hearing. She was unable to provide Doe 2's current location, but said she would contact several family members to see what information they could provide. When Sergeant Gagan checked back with her a few days later, she told him her efforts had been unsuccessful. Gagan contacted the jail facilities for Alameda, Sail Francisco, Contra Costa, and Solano counties. He further searched the booking information on Doe 2 kept by the Fremont, Hayward, and Oakland police departments. He found an address in Oakland listed for Doe 2, but determined the address was not current. He checked her driver's license records, which only disclosed the mother's address he already had. He also checked the drug rehabilitation center where she had been a patient, but that source did not provide any useful information on her current whereabouts. He went to the area that Doe 2's mother said she frequented, and asked dozens of women he believed would know, or recognize, Doe 2 whether they knew where he might find her. This effort produced one possible address, but Gagan determined the woman residing at that address resembled, but was not, Doe 2. He met with Doe 2's mother again on November 12. He went through the mother's personal telephone book page by page discussing each friend or relative who might know where Jane Doe 2 was. The mother finally informed Sergeant Gagan that Doe 2 was homeless, using drugs, and was avoiding contact with anyone because she had a warrant out for her arrest. Gagan later confirmed that there was an outstanding warrant.

(Ans., Ex. F at 26–27.)

Prior trial testimony may be deemed reliable for admission if the declarant becomes unavailable to testify at trial, see Mancusi v. Stubbs, 408 U.S. 204, 216 (1972), as may prior preliminary hearing testimony, see California v. Green, 399 U.S. at 165–66, or prior deposition testimony, see U.S. v. Medjuck, 156 F.3d 916, 920 (9th Cir. 1998).

The government must show that the witness is "unavailable." See Terrovona v. Kincheloe, 852 F.2d 424, 427 (9th Cir. 1988) (dead witness). This requires that the prosecutor make a good faith effort to obtain the witness's presence. See Barber v. Page, 390 U.S. 719, 724-25 (1968); U.S. v. Aguilar, 295 F.3d 1018, 1020 (9th Cir. 2002) (where witnesses could not be compelled to travel to United States, government satisfies attempt to secure defendant's physical presence where it demonstrates it investigated, but ultimately rejected, the possibility of having defendant attend deposition in another country because of

possibility he would not be returned to U.S. custody); <u>U.S. v. Olafson</u>, 213 F.3d 435, 441–42 (9th Cir. 2000) (good faith effort demonstrated where border patrol agents called witness, who had been inadvertently returned to Mexico, but witness refused to return to testify); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1102 (9th Cir. 1998) (prosecutor made a good-faith effort to locate witness where he subpoenaed witness, met with witness to discuss proposed testimony after issuing subpoena, tried to call witness three times as trial date approached, contacted witness's parole officer, had a bench warrant issued for witness's arrest, and assigned a criminal investigator to locate witness).

On these facts and under these legal principles, the Court cannot say that the state appellate court's adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The record indicates that the government conducted a thorough search for Doe 2 by issuing many subpoenas, calling hospitals and the Department of Corrections, investigating detention records in several counties, and finally by contacting Doe 2's mother, who was unable to provide help. The thoroughness of this search, as demonstrated by this record, indicates that a good faith effort was made to find Doe 2, and therefore the trial court's determination that Doe 2 was unavailable to testify was reasonable. Accordingly, this claim is DENIED.

**8.    Recusal Motion**

Petitioner claims that the trial court violated his Sixth Amendment right to counsel when it denied Petitioner's motion to recuse the prosecutor. This motion was based on defense counsel's alleged conflict with Petitioner about the filing of such a motion. (Pet. at 32.)

The state appellate court summarized the facts and its holding as follows:

[Petitioner] next argues that his counsel had a conflict representing him with respect to the motion to recuse the district attorney's office, and that the conflict adversely affected counsel's performance not only on the motion to recuse, but also the remainder of the trial.

[Petitioner] originally made the motion to recuse the district attorney's office

during a period of self-representation, but by the time the motion was heard, [Petitioner] was represented by Mr. Jamieson of the alternate defender's office. [Petitioner] claimed that the entire district attorney's office should be recused because he intended to call some members as witnesses in support of his contention that the district attorney had failed to comply with, and had tampered with transcripts showing, the terms of the 1993 plea involving Jane Doe 6. [Petitioner] believed that the terms of that plea should have resulted in dismissal of the section 220 count and reduction of a section 245 felony to a misdemeanor. On the merits of the motion, the court ruled that [Petitioner] had failed even to make an adequate prima facie showing requiring a response, and denied the motion.

[Petitioner] contends that a conflict arose in the context of the recusal motion because defense counsel told [Petitioner] he "could not subpoena certain witnesses that he wanted . . . because they were attorneys in my office." [Petitioner] further asserts that the court was put on notice of the conflict when defense counsel advised the court that he was willing to present the motion [Petitioner] had filed in propre persona, but that he had informed [Petitioner] he could not subpoena these witnesses because he considered "that to be a conflict." [Petitioner] argues that this statement triggered the duty of the court to inquire into the possibility of a conflict and, if necessary, obtain [Petitioner]'s informed waiver. [Citation removed.] He further contends reversal of all of his convictions is required because the court failed to conduct an inquiry and the conflict adversely affected counsel's performance, not only on the motion, but also the rest of the trial.
. . . .

We question in the first instance whether defense counsel's comment was even an indication of a potential or actual conflict sufficient to trigger the duty to conduct some inquiry. We understand counsel to have been explaining that the reason he told [Petitioner] he would not subpoena witnesses from his own office was that, if he did, a conflict would be created, and therefore that he had avoided a conflict by declining to subpoena them. Assuming arguendo that the duty to inquire was triggered, the court performed its duty. It asked for confirmation from counsel that the same evidence "could be presented by way of [Petitioner] if need be," and defense counsel agreed that was "correct." Nor was there any offer of proof, or other indication of who the witnesses were, or that they could testify to facts that would have supported [Petitioner]'s claim. Moreover, the court ascertained [Petitioner] had unsuccessfully made the claim that the charges should have been reduced or dismissed in an appeal and petition for a writ of habeas corpus, and that this court found the terms of the pleas did not require automatic dismissal. In the absence of some indication that the witnesses in defense counsel's office could actually provide testimony in support of [Petitioner's] claim, that the same facts could not be established by another means, and that the claim itself had merit, the existence of a potential or actual conflict was supported by nothing more than speculation. The court therefore satisfied itself that any potential or actual conflict was too slight to require further inquiry. We agree that the conflict "was so remote and tenuous that it did not require the court to inquire further than it did." [Citation removed.]

(Ans., Ex. F at 28–30.)

The ultimate inquiry in a federal habeas proceeding on a claim regarding a ruling on a

24

change of counsel motion is whether a petitioner's Sixth Amendment right to counsel was violated. Scheol v. Weitek, 218 F.3d 1017, 1024–25 (9th Cir. 2000). In other words, the habeas court considers whether the trial court's denial of or failure to rule on the motion regarding attorney-client conflict "actually violated [the criminal defendant's] constitutional rights in that the conflict between [the criminal defendant] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Id. at 1026. In determining whether the trial judge should have granted a substitution motion, the reviewing habeas court may consider the extent of the conflict, whether the trial judge made an appropriate inquiry into the extent of the conflict, and the timeliness of the motion to substitute counsel. Daniels v. Woodford, 428 F.3d 1181, 1197–98 (9th Cir. 2005).

Applying these legal principles to the instant matter, the Court concludes that Petitioner has not shown that he is entitled to habeas relief on this claim. Firstly, the record cited above supports the conclusion that the trial court conducted a sufficient inquiry into the alleged conflict. Secondly, and most importantly, the record supports the trial court's conclusion that the alleged conflict was too speculative to have created on its own a constitutionally significant impediment to the attorney-client relationship. Apart from this alleged conflict, the record indicates that defense counsel and Petitioner were able to work together to present a defense to the charges. Finally, with respect to the notion that the district attorney's office should have been recused, Petitioner's assertion of record-tampering lacked any evidentiary support. On such a record, Petitioner's claim is DENIED.

**9.      Disclosure of Exculpatory Evidence**

Petitioner claims that the prosecution withheld material evidence regarding Officer Cantrell, thereby violated his due process rights as they are articulated in Brady v. Maryland, cited above. (Pet. at 33.) The state appellate court did not address this claim in its written opinion.

Officer Cantrell was the investigating officer in the crimes involving Jane Does 2 and 4. (Pet., Ex. A.) Petitioner alleges that Officer Cantrell committed perjury in his testimony at a trial unrelated to the instant matter. (Id. at 1.) Petitioner also alleges that Cantrell was having a sexual relationship with a witness in yet another trial at which he presumably testified. (Id. at 1–2.) The sole evidence for these assertions is a declaration signed by a person named Terry Thomas. (Id., Ex. B.)

The government has an obligation to surrender favorable evidence that is "material either to guilt or to punishment," even if the defendant does not request disclosure of such evidence. Brady, 373 U.S. at 87; U.S v. Agars, 427 U.S. 97, 107 (1976). Such evidence includes impeachment evidence. U.S. v. Bailey, 473 U.S. 667, 676 (1985). To establish a Brady violation, the defendant must show that exculpatory or impeaching evidence was suppressed by the state, either willfully or inadvertently, resulting in prejudice. Morris v. Aalst, 447 F.3d 735, 741 (9th Cir. 2006). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bailey, 473 U.S. at 682. The suppressed evidence need not be sufficient to affirmatively prove the defendant innocent; it need only be favorable and material. Gantt v. Roe, 389 F.3d 908, 912 (9th Cir. 2004).

Here, Petitioner has not shown that the evidence was material. Put another way, Officer Cantrell's testimony was not so significant such that had his credibility been impeached, there is a reasonable probability adequate to undermine confidence in the outcome. With respect to his testimony regarding Doe 2, Cantrell testified that Doe 2 stopped him while he was on his police rounds, reported that Petitioner had raped her, provided him with a description of her assailant, and returned with him to the trailer, the scene of the crime. (Ans., Ex. 11 at 1354–64.)

With respect to his testimony regarding Doe 4, Cantrell testified that he first saw Doe

4 in the hospital, where she had been sent as treatment for the injuries Petitioner allegedly

inflicted on her.  While there, Cantrell interviewed Doe 4 regarding the attack, and she

selected Petitioner's photograph from a line-up.  (<u>Id.</u> at 1337–47.)

While this testimony regarding the investigation is important, Petitioner has not shown

that had the jury rejected it on grounds that Cantrell was not credible there is a reasonable

probability that confidence in the outcome would have been undermined.  Simply put, the

testimony of Does 2 and 4 provided first-hand evidence that directly supported the charges.

Cantrell's testimony was about surrounding events, and contained little that added to the

testimony of the victims.  Accordingly, Petitioner's claim is DENIED.

**10.    Denial of Motion for a Continuance**

Petitioner claims that the trial court violated his due process right to present a defense

and his Sixth Amendment right to counsel when it denied his motion for a continuance so

that he could call a defense witness to testify.  (Pet. at 42.)

The state appellate court summarized the relevant facts and its holding as follows:

> During trial, [Petitioner] sought a continuance to secure the presence of a
> witness, Ronald Brown.  The court heard testimony in support of the motion on
> the seventh day of the trial.  Defense investigator John Baden testified that he
> had started looking for Brown one week earlier, and that, the preceding day, he
> had located Brown in custody at the Vacaville Medical Facility.  Defense
> counsel initially represented that Brown would testify that he "was in the park
> at the time of the Jane Doe 1 incident," and that "Jane Doe 1 came back after
> being with Mr. Turner and smelted cocaine with him and Mr. Brown and
> bragged about having an affair with Mr. Turner."  The court did not
> immediately rule on the motion.  Four days later, defense counsel made a
> revised offer of proof.  He stated:  "I don't know exactly what he is going to
> say.  But I was informed he was in the park on the day of the incident with
> regard to Jane Doe 1 and would be able to testify she is a prostitute and a liar."
> Defense counsel stated he had not taken steps toward obtaining a removal
> order, and that process would take approximately two weeks.  The court denied
> the motion noting that Ronald Brown's testimony that Jane Doe 1 was a
> prostitute was cumulative of other evidence, and although relevant, his opinion
> that she is a liar was not so crucial to the defense that it warranted a two-week
> delay of the trial.
> . . . .
>
> Jane Doe 1 had already testified that she was a "known prostitute," and had
> been impeached with two convictions for petty theft, and two convictions for
> prostitution.  The court therefore was well within its discretion, based upon the
> revised proffer that Brown would testify that Doe 1 was a liar and a prostitute,
> to conclude that testimony that was cumulative of other evidence and was of

27

insufficient material value to warrant a two week continuance.

(Ans., Ex. F at 30–32.)

To establish a constitutional violation based on the denial of a continuance motion, a petitioner must show that the trial court abused its discretion, which will be found if, after carefully evaluating all relevant factors, the denial was arbitrary or unreasonable. See Armant v. Marquez, 772 F.2d 552, 556 (9th Cir. 1985). In considering whether the denial of a continuance implicating a defendant's Sixth Amendment right to counsel is an abuse of discretion, the Ninth Circuit has applied the factors set forth in U.S. v. Robinson, 967 F.2d 287, 291 (9th Cir. 1992): (1) whether the continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the defendant's fault; and (5) whether a denial would prejudice the defendant. See U.S. v. Mejia, 69 F. 3d 309, 314 (9th Cir. 1995). But the ultimate test remains whether the trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Houston v. Schomig, 533 F.3d 1076, 1079 (9th Cir. 2008) (quoting Morris v. Slappy, 461 U.S. 1, 11–12 (1983)) (internal quotation marks omitted).

Here, Petitioner has not shown that the state appellate court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, as an analysis under the Mejia factors demonstrates.

The first factor weighs in favor of Respondent. A delay of two-weeks during midtrial would unquestionably inconvenience the court, counsel, and the parties. The second factor does not appear to be relevant. The third and fourth factors overlap each other, and weigh in favor of Respondent. Specifically, Petitioner has not shown why his request for Brown's presence was untimely, or why he had delayed listing Brown as a witness until mid-trial. The fifth and last factor weighs in favor of Respondent as well because Brown's testimony

1   was duplicative, and its absence cannot have resulted in prejudice.  Petitioner himself

2   rendered Brown's testimony duplicative when Petitioner's second offer of proof omitted the

3   prior assertion that Brown would testify that Doe 1 had "bragged" about her sexual affair

4   with Petitioner.  Such a significant omission rendered Brown's proffered testimony

5   duplicative, and it provides a strong basis to support this Court's determination that the trial

6   court's decision was not based on an "unreasoning and arbitrary insistence upon

7   expeditiousness in the face of a justifiable request for delay."  Houston v. Schomig, 533 F.3d

8   1076, 1079 (9th Cir. 2008).  Accordingly, Petitioner's claim is DENIED.

9   **11.     CALJIC 2.50.01**

10          Petitioner claims that the 2002 version CALJIC No. 2.50.01, in combination with

11  other jury instructions CALJIC Nos. 2.50.1 and 2.50.2, all of which were given at the trial,

12  lowered the prosecutor's burden to prove Petitioner's guilt beyond a reasonable doubt.  (Pet.

13  at 43.)  The state appellate court rejected this claim because the California Supreme Court

14  has approved of the 2002 version of this jury instruction.  (Ans., Ex F at 32.)

15          The trial court gave the jury the 2002 version of CALJIC No. 2 .50.01, which reads

16  in relevant part:

17          [I]f you find by a preponderance of the evidence that [Petitioner] committed
            prior sexual offenses, that is not sufficient by itself to prove beyond a
18          reasonable doubt that he committed the charged crimes.

19          If you determine an inference properly can be drawn from this evidence, this
            inference is simply one item for you to consider, along with all other evidence,
20          in determining whether [Petitioner] has been proved guilty beyond a reasonable
            doubt of the charged crime.  You must not consider this evidence for any other
21          purpose.

22  (Ans., Ex. A, Vol. 5 at 1830–31.)  The trial court also gave CALJIC No. 2.50.1, which reads

23  in relevant part:

24          Within the meaning of the preceding instructions, the prosecution has the
            burden of proving by a preponderance of the evidence that [Petitioner]
25          committed crimes or sexual offenses other than those for which he is on trial.

26          You must not consider this evidence for any purpose unless you find by a
            preponderance of the evidence that [Petitioner] committed the other sexual
27          offenses.

28

29

> If you find other crimes were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before [Petitioner] can be found guilty of any crime charged or any included crime in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that [Petitioner] is guilty of that crime.

(Id. at 1834.).  CALJIC No. 2.50.2, which was also given to the jury, discusses the preponderance of the evidence standard.  (Id. at 1835.)

Older versions of CALJIC No. 2.50.01 and 2.50.1 were  determined to be constitutionally flawed.  In 2004, the Ninth Circuit concluded that the "interplay of the two instructions [CALJIC Nos. 2.50.01 and 2.50.1 in their 1999 versions] allowed the jury to find that [the criminal defendant] committed the uncharged sexual offense by a preponderance of the evidence and thus to infer that he had committed the charged acts based upon facts not found beyond a reasonable doubt, but by a preponderance of the evidence."  Gibson v. Ortiz, 387 F.3d 812, 822 (9th Cir. 2004).  Here, however, Petitioner's jury was instructed on the revised version of CALJIC No. 2.50.01, which, unlike the version at issue in Gibson, contains the constitutionally required reasonable doubt language.

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove every element charged in a criminal offense beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364 (1970).  If the jury is not properly instructed that a defendant is presumed innocent until proven guilty beyond a reasonable doubt, the defendant has been deprived of due process.  See Middleton v. McNeil, 541 U.S. 433, 436 (2004).  Any jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden . . . is plainly inconsistent with the constitutionally rooted presumption of innocence."  Cool v. U.S., 409 U.S. 100, 104 (1972).

Turning to the instant action, Petitioner's constitutional objections to CALJIC No. 2.50.01, and its interplay with other jury instructions, are without merit.  The 2002 version clearly states that Petitioner's guilt on the charged offenses must, consonant with Winship, be established beyond a reasonable doubt.  That the instruction permits the use of the preponderance standard in determining whether Petitioner committed uncharged offenses

does not reduce the prosecution's <u>Winship</u> burden regarding <u>charged</u> offenses, which, as just stated, CALJIC No. 2.50.01 itself reiterates and reinforces: "if you find by a preponderance of the evidence that [Petitioner] committed a prior sexual offense or offenses, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether [Petitioner] has been proved guilty beyond a reasonable doubt of the charged crime." Reading the instruction in tandem with CALJIC Nos. 2.50.1 and 2.50.2 does not change the Court's conclusion. In sum, as read to Petitioner's jury, these instructions sufficiently informed the jury that it could find Petitioner guilty of the charged offenses only upon a showing of proof beyond a reasonable doubt. This claim is DENIED.

## 12. CALJIC No. 2.21.1

Petitioner claims that the use of CALJIC No. 2.21.2 lowered the prosecution's burden from proving Petitioner's guilt beyond a reasonable doubt to proving it by a preponderance standard. (Pet. at 45.) The California Supreme Court having rejected such claims, the state appellate court denied this claim. (Ans., Ex. F at 32–33.)

CALJIC No. 2.21.2, as given to Petitioner's jury, reads as follows: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." (<u>Id.</u>, Ex. A, Vol. 5 at 1821.)

The Ninth Circuit has rejected similar claims regarding CALJIC No. 2.21.2. <u>See</u> <u>Turner v. Calderon</u>, 281 F.3d 851, 865–66 (9th Cir. 2002). "[B]ecause the jury 'remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible,' the instruction could not be applied in a way that challenged the Constitution." <u>Id.</u> at 866 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 149 (1973)).

This Court is bound by the Ninth Circuit's holding in <u>Turner</u>. Accordingly,

1    Petitioner's claim is DENIED.

2    **13.    Alleged Prosecutorial Misconduct**

3        Petitioner claims that the trial court violated his due process right to a fair trial when it

4    did not declare a mistrial after the jury witnessed two victims hugging the prosecutor.  (Pet.

5    at 47.)   Petitioner contends that such incidents "improperly appealed to the jurors' passions

6    and effectively vouched for the credibility of the witnesses in a manner condemned in

7    prosecutorial misconduct cases."  (Id. at 48.)

8        After these incidents, defense counsel moved for an admonition, and then moved for a

9    mistrial.  The trial court instructed the jury to disregard the incidents, and denied the motion

10   for a mistrial.  The state appellate court rejected Petitioner's claim, as discussed as follows:

11           In denying the notion for a mistrial, the court stated, among other things, that
             its own observations were consistent with the prosecutor's assertion that these
12           were spontaneous acts initiated by the witnesses after giving emotional
             testimony.  The prosecutor's only alternative would have been to shrug off or
13           resist the hug, which could have carried its own set of unintended messages to
             the jury.  We fail to see how this brief spontaneous human interaction qualifies
14           as "egregious" and "intemperate behavior" [citation removed] a "deceptive or
             reprehensible method" [citation removed] to influence the jury.  Moreover,
15           although the hugging incidents are at least arguably susceptible of the
             interpretation that the prosecutor believed the witnesses' testimony, the act of
16           hugging was too equivocal to qualify as vouching for their credibility.  The
             hugs could equally have been understood by the jury as an expression of
17           gratitude to the prosecutor, or simply an expression of relief that the difficult
             testimony was over.  In any event, the possibility that the jury might infer from
18           this equivocal conduct that the prosecutor was vouching for the credibility of
             these witnesses was not so overwhelming that the potential prejudice could
19           not be cured by the appropriate admonition.  The court gave such an admonition,
             at defense counsel's request, and expressly directed the jury to "disregard that
20           conduct."  "We assume the jury abided by the court's admonitions and instructions,
             and thereby avoided any prejudice."  [Citation removed.]
21

22   (Ans., Ex. F at 33–34.)

23        Petitioner's claim is without merit.  Firstly, there is no evidence of prosecutorial

24   misconduct.  Rather, the record indicates that the witnesses hugged the prosecutor without

25   invitation.  Responsibility for such spontaneous behavior unmotivated by the prosecutor

26   cannot be laid at the feet of the prosecutor, and therefore cannot form the basis for a claim of

27   prosecutorial misconduct.  Secondly, the Court must assume that the jurors followed the trial

28

court's instructions to disregard the incidents.  Accordingly, this claim is DENIED.

**14.    Alleged Cumulative Error**

Petitioner claims that the cumulative effect of various trial errors resulted in prejudice.  (Pet. at 50.)

Although no single trial error is sufficiently prejudicial to warrant the granting of relief, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893–95 (9th Cir. 2003).  However, where no single constitutional error exists, there can be no cumulative error.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

Petitioner has not shown that there were any constitutional errors at trial. Accordingly, the Court concludes that Petitioner has not shown that there was cumulative error.  On this basis, Petitioner's claim is DENIED.

**15.    Change of Counsel**

Petitioner claims that the trial court denied Petitioner his rights to due process and to the effective assistance of counsel when it failed to inquire into a conflict of interest and hold a Marsden hearing.  (Pet. at 51.)

The state appellate court summarized the facts and its holding as follows:

> [Petitioner] filed a handwritten motion for a new trial that raised, among other things, claims of ineffective assistance of counsel.  He contends the court had a sua sponte duty to conduct a Marsden hearing (People v. Marsden (1970) 2 Cal.3d 11 8), and appoint substitute counsel to represent [Petitioner] on this motion.

> Although under some circumstances the trial court may, upon request, have a duty to conduct an inquiry into counsel's competence and appoint substitute counsel to represent a defendant on a motion for a anew trial based upon ineffective assistance of counsel, the trial court has no duty to conduct such an inquiry sua sponte.  [Citation removed.]  There must be a request for substitute counsel or "at least some clear indication by [Petitioner] that he wants a substitute attorney."  [Citation removed.]

> [Petitioner] made no request for substitute counsel in writing, nor did he make any such request at the sentencing hearing when the court heard argument on the motion for a new trial. He also stood by, without objection, while his defense counsel argued the merits of the motion.  Nevertheless, [Petitioner] contends that a brief reference to [citation removed] in his handwritten points and authorities in support of the motion for a new trial, was sufficient to trigger

33

the duty of the trial court to conduct a <u>Marsden</u> inquiry.

> The mere reference to [a state case] does not constitute a "clear indication" [citation removed] that [Petitioner] wanted a substitute attorney to represent him on the motion for a new trial. The decision in [that case] itself held the procedures for appointment of substitute counsel on a new trial motion are triggered upon a request for substitute counsel. [Citation removed.] Not only did [Petitioner] make no such request, his actions and those of his counsel at the hearing on the motion clearly conveyed that he did not seek appointment of substitute counsel. [Petitioner] did not raise the issue in writing or orally at the hearing, and he made no objection when his defense counsel proceeded to argue the motion on the merits. Moreover, when the court inquired if there was "anything else" before it ruled on the motion, [Petitioner] <u>personally</u> responded that the matter was "submitted." The court then reviewed and denied the motion for a new trial. [Petitioner]'s appointed counsel continued to represent him for the purpose of sentencing, also without objection.
> . . . .
>
> We conclude [Petitioner] did not request substitute counsel to represent him on his motion for a new trial, and the court therefore had no duty to conduct a <u>Marsden</u> inquiry.

(Ans., Ex. F at 34–35, 36.)

Petitioner's claim is without merit. Firstly, Petitioner has shown no binding authority that a trial court has a constitutionally imposed duty to sua sponte hold a hearing on the question of a change of counsel. Even if there were such a duty, there is nothing in the record that indicates the trial court should have held such a hearing. Petitioner either raised no objections to the proceedings, or affirmatively approved of them. Secondly, Petitioner's claim is, in truth, a claim that he received ineffective assistance of counsel. On that point, Petitioner has not shown that defense counsel's performance in this or in any other instance was deficient, or that such performances resulted in prejudice. Accordingly, this claim is DENIED.

## PENDING MOTIONS

This action has two pending motions.

In the first, Petitioner moves for reconsideration of an ex-parte restraining order, and for the appointment of counsel. (<u>See</u> Docket No. 22.)

As to his request for a restraining order, Petitioner has not articulated any basis on which the Court could issue such an order. Accordingly, such request is DENIED.

As to his request for the appointment of counsel, the Court first notes that there is no right to counsel in habeas corpus actions. <u>See</u> <u>Knaubert v. Goldsmith</u>, 791 F.2d 722, 728 (9th Cir. 1986). However, 18 U.S.C. § 3006A(a)(2)(B) authorizes a district court to appoint counsel to represent a habeas petitioner whenever "the court determines that the interests of justice so require" and such person is financially unable to obtain representation. The decision to appoint counsel is within the discretion of the district court, <u>see</u> <u>Chaney v. Lewis</u>, 801 F.2d 1191, 1196 (9th Cir. 1986), and should be granted only when exceptional circumstances are present. <u>See</u> <u>generally</u> 1 J. Liebman & R. Hertz, <u>Federal Habeas Corpus Practice and Procedure</u> § 12.3b at 383–86 (2d ed. 1994). Petitioner has not shown that there are exceptional circumstances warranting appointment of counsel on appeal. Accordingly, Petitioner's request is DENIED.

In the second motion, Petitioner asks for a writ of mandamus, judicial notice, and declaratory relief. (<u>See</u> Docket No. 25.) In his filing, Petitioner reiterates his arguments in favor of his petition for writ of habeas corpus, and alleges civil rights claims against the California Department of Corrections and its employees.

The Court denies Petitioner's requests. Firstly, the Court has already considered — and rejected — the arguments Petitioner reiterates in his motion. Secondly, Petitioner's civil rights claims cannot be appropriately addressed in this federal habeas corpus action. If Petitioner seeks relief for such claims, he must file a separate civil rights action. Accordingly, Petitioner's requests under Docket No. 25 are DENIED.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner's motion for reconsideration of an ex parte temporary restraining order and for the appointment of counsel (Docket No. 22) is DENIED. Petitioner's request for a writ of mandamus, judicial notice, and declaratory relief are also (Docket No. 25) DENIED.

This order terminates Docket Nos. 22 and 25.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondent, terminate all pending motions, and close the file.

**IT IS SO ORDERED**.

DATED: 2/24/2010

_____
MARILYN HALL PATEL
United States District Judge

**NOTES**

1. The jury convicted Petitioner of forcible oral copulation (Cal. Pen. Code, § 288a(c)(2)), forcible rape (§ 261(a)(2)), aggravated assault (§ 245(a)(1)), false imprisonment by violence (§§ 236, 237), making criminal threats (§ 422), kidnapping (§ 207), residential robbery (§§ 211, 212.5), and torture (§ 206). The court also found true allegations of seven prior convictions under the Three Strikes Law (§ 1170.12), several prior serious felony convictions (§ 667(a)(1)), a prior conviction under the One Strike Law (§ 667.61) and two prior prison terms (§ 667.5(b)).

2. Petitioner also claims that defense counsel failed to challenge weaknesses in the prosecution case. (Pet. at 9.) Petitioner's allegation in truth relates to alleged violations of his state rights to counsel. Violations of state constitutional or statutory rights are unremediable in this Court. A writ of habeas corpus under 28 U.S.C. § 2254 is unavailable for violations of state law or for alleged error in the interpretation or application of state law. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991).

3. Petitioner states that owing to his illness, defense counsel was not present for the presentation of the verdict, and that he died soon after the trial concluded. (Pet. at 6.) Respondent disputes this, asserting that defense counsel was absent on that day because of he had to have a "routine medical procedure." (Ans. at 8). Respondent also asserts that defense counsel is in fact still alive. (Id.)

4. California's Three Strikes law, which appears in California Penal Code section 667(b)–(i), was enacted by the Legislature and became effective March 7, 1994. The heart of the Three Strikes law is subdivision (e) of section 667, which prescribes increased terms of imprisonment for defendants who have previously been convicted of certain "violent" or "serious" felonies, see Cal. Penal Code § 667(d).

5. Petitioner also alleges a violation of his right to equal protection, yet he has not articulated a separate basis for such a claim. Accordingly, the Court addresses only his due process claim.